# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| LOIS TRAYLOR-LAMB, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 05-2971 |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

## Memorandum and Order

YOHN, J.                                                                July ___, 2007

Plaintiff Lois Traylor-Lamb appeals the decision of the Commissioner of Social Security

("the Commissioner")[1] denying her claims for supplemental security income ("SSI"), disability

insurance benefits ("DIB") and widow's insurance benefits ("WIB") under Titles II and XVI of

the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433.  Plaintiff and the Commissioner have

filed cross motions for summary judgment (now titled in the Clerk's standard procedural order as

a Request for Review, Response and Reply).  I referred the motions to U.S. Magistrate Judge

Carol Sandra Moore Wells, who submitted a report and recommendation that I grant plaintiff's

motion in part and deny it in part, deny the Commissioner's motion for summary judgment, and

remand to the Commissioner for further proceedings.  The Commissioner has filed objections to

the report and recommendation, and plaintiff has filed a response thereto.  For the following

---

[1]The named defendant in the instant suit was originally former Commissioner Jo Anne B. Barnhart; the current Commissioner, Michael J. Astrue, has been substituted pursuant to Federal Rule of Civil Procedure 25(d)(1).

1

reasons, I will overrule the government's objections, adopt the report and recommendation of

Magistrate Judge Wells, and remand the case for further proceedings consistent with this

memorandum and order.

## I.  Procedural History

Plaintiff protectively filed for SSI, DIB, and WIB on December 23, 1997, alleging

disability since July 1, 1997, based on anxiety, depression, high blood pressure and bronchitis.

(R. 92-97, 111, 228-30.)[2]  Plaintiff's application was denied initially and on reconsideration.  (R.

57-76, 226-27, 231-36.)  She timely requested review by an Administrative Law Judge ("ALJ")

and a hearing was held on October 4, 1999.  (R. 77.)  At the hearing, plaintiff, who was

represented by counsel, and a vocational expert ("VE"), testified before an ALJ.  (R. 240-73.)

The ALJ denied plaintiff's application on November 23, 1999, finding that she was able to

perform work that is simple, repetitive and routine in nature at all exertional levels and thus, not

disabled.  (R. 292-303.)  The Appeals Council denied plaintiff's request for review on January

25, 2002, making the ALJ's decision the final decision of the Commissioner.  (R. 8-11.)  On

March 29, 2002, plaintiff appealed that decision to the United States District Court for the

Eastern District of Pennsylvania, whereupon I referred the case to Magistrate Judge Wells for a

report and recommendation.  Without objection from the parties, on April 23, 2004, I adopted the

report and recommendation of Magistrate Judge Wells and remanded the case to the

Commissioner for further proceedings, consistent with that report and recommendation.  (R. 317-

---

[2]Plaintiff previously filed for DIB on April 7, 1995, which was denied on July 5, 1995, but plaintiff apparently never appealed that decision.  (R. 29-32, 33-35, 37.)

338.)  On September 20, 2004, the Appeals Council subsequently vacated the ALJ's decision and remanded plaintiff's application for further proceedings, as required by this court.  (R. 339-40.)

On January 20, 2005, a second hearing was held before another ALJ.  Plaintiff, Dr. Richard Saul, a medical expert ("ME"), and VE Bruce Martin testified.  (R. 496-543.)  In a decision issued on April 2, 2005, the ALJ concluded that plaintiff was not disabled.  (R. 280-91.)  Specifically because, in the absence of substance abuse, plaintiff could perform a range of simple, routine work that allowed for moderate deficits in social functioning and concentration, at the medium exertional level, and in a clean environment.  (R. 290-91.)  Plaintiff properly commenced the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

I referred the action to Magistrate Judge Wells who issued a comprehensive report and recommendation that plaintiff's motion for summary judgment be granted in part and denied in part, the Commissioner's motion be denied, and the matter be remanded for further proceedings consistent with the report and recommendation.  (Rep. & Recom. 1.)  The government filed objections to the report and recommendation on June 6, 2007 and plaintiff filed a response shortly thereafter.

**II.  Factual History and Hearing Testimony**

Plaintiff was born on March 15, 1944, making her sixty-one years old at the time of the ALJ's decision on April 2, 2005.  (R. 29, 92, 96, 228-30, 280-91.)  She has an eleventh grade education.  (R. 116, 503.)  Plaintiff has past relevant work experience as a meat packer, nursing assistant and potato wrapper.  (R. 55, 116, 268, 506-07.)

### A.  Mental Impairments

On July 22, 1997, plaintiff's physician, Dr. Julius A. Mingroni, in a form for the

Pennsylvania Department of Public Welfare, opined that plaintiff was temporarily disabled due

to severe anxiety, major depression, hypertension, and chronic bronchitis.  (R. 188.)  He reported

that she could not work because she was "very anxious" and had "depression," but her

medication, which he reported as Prozac, led to drowsiness.  (R. 186.)   In December of 1997, Dr.

Mingroni diagnosed depression and prescribed Prozac.  (R. 171.)

Following an incident where plaintiff attacked her sister, in April 1998, pursuant to a

court order, plaintiff underwent a mental health evaluation and was scheduled for three to six

months of treatment.  (R.162-65, 175.)  The mental health records from Citizens Acting Together

Can Help ("CATCH"), Community Mental Health/Mental Retardation Center, reveal complaints

of anxiety, depression, suicidal ideation, sleeplessness, lack of appetite, ringing in her ears, loose

bowels and shortness of breath.  (R. 162-65, 170.)  Plaintiff reported using marijuana, social

drinking, and smoking one pack of cigarettes per day.  (R. 162.)  The examiner described her as

having a sad affect, depressed mood, poor memory, and with mild auditory / visual

hallucinations.  (R. 163-64.)  The examiner also reported plaintiff as being well groomed with

appropriate behavior, good concentration, and intact reasoning, judgment, and insight.  (R. 163-

64.)  The interviewer, J. Miller, diagnosed recurrent major depressive disorder and past physical

abuse and rape, assigned a Global Assessment of Functioning score of forty and recommended

individual therapy and psychiatric evaluations.  (R. 164-65.)

Dr. Mingroni continued to treat plaintiff's complaints and diagnosed depression and

anxiety throughout 1998 - 2003, and prescribed Zoloft and Avitan.  (R. 168, 171-73, 217, 219,

4

221, 407-31.)  On January 3, 2005, he additionally prescribed Xanax.  (R. 408-09.)

Plaintiff underwent several psychiatric assessments.  In a report dated June 9, 1998, a state agency psychiatrist, Dr. Gerald A. Fishman, described his consultative examination of plaintiff.  (R. 190-93.)  Dr. Fishman noted plaintiff's complaints that she "feels agitated," "jumpy, very nervous, fearful of something happening, . . . depressed, has trouble functioning and she hears a voice."  (R. 190.)  He also reported that "[s]he has trouble sleeping, trouble communicating and does not like to be around people."  (*Id.*)  He summarized by stating that "the picture [plaintiff] presents is one of a rejection sensitivity impulsivity, much anger, tendency to act out, depression, multiple fears, and neurosis."  (R. 191.)  Dr. Fishman further noted that plaintiff's concentration and task persistence are reduced, and her reaction to stress is to "get panicky."  (R. 192.)  Plaintiff gave inaccurate responses to several questions, and indicated an inability to interpret proverbs, but after some reluctance was able to perform serial threes with only one error.  (*Id.*)  Dr. Fishman noted "[s]he also evidently has an alcohol problem." (R. 193.)  He opined that plaintiff's symptoms were "compatible with Borderline personality disorder" and "advised her to continue with her therapy at CATCH."  (R. 192-93.)

In June 1998, a state agency psychologist reviewed plaintiff's records and completed a mental residual functional capacity ("RFC") assessment of plaintiff and a psychiatric review technique form.  (R. 140-42, 153-61.)  The examiner found moderate limitations in plaintiff's ability to understand, remember and carry out detailed instructions; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at

5

a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (R. 140-41.)  In all other categories the examiner found plaintiff was not significantly limited.  (R. 140-41.)  Specifically, the examiner noted that plaintiff "shows affective symptoms and personality disorder symptoms and uses substances to excess."  (R. 142.)  The examiner further opined that "substance abuse exacerbates her symptoms, rendering her unable to sustain on task behavior and maintain appropriate social behavior."  (R. 142.)  In the absence of alcohol or drugs the examiner believed plaintiff "would be stable enough for [significant gainful activity]."  (*Id.*)  The examiner assessed that plaintiff met the "A" criteria of Listing 12.04 Affective Disorders, characterized by anhedonia or pervasive loss of interest in almost all activities, psychomotor agitation or retardation, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide.  (R. 156.)  The examiner also assessed plaintiff as meeting the "A" criteria for Listing 12.08 Personality Disorder, as evidenced by pathologically inappropriate suspiciousness or hostility, persistent disturbances of mood or affect, and pathological dependence, passivity or aggressivity.  (R. 158.)  The presence of Listing 12.09 Substance Addiction Disorder was also noted.  (R. 159.)  However, the examiner opined that plaintiff's symptoms did not satisfy the "B" criteria of the relevant Listings, finding that plaintiff was only slightly limited in her activities of daily living, had moderate difficulties in maintaining social functioning, often had deficiencies of concentration, persistence or pace, and never had episodes of deterioration or decompensation.  (R. 160.)

Plaintiff underwent another consultative examination in October 28, 1998, by a psychiatrist, Dr. Perry Ottenberg.  (R. 195-202.)  Dr. Ottenberg noted that plaintiff complained of panic attacks that "she feels two or three times a week," which plaintiff explained began when she was around the age of eighteen and was raped.  (R. 195.)  On mental status, simple judgment questions were intact, but plaintiff had a great deal of difficulty concentrating.  (R. 196.)  Dr. Ottenberg described her affect as "show[ing] mild depressive symptomology but acute anxiousness and anxiety attacks in the neurotic sphere."  (R. 197.)  The examiner summarized: "This is a woman with a history of acting out violently.  It is unclear as to how much alcohol she is consuming and how this plays a part in her anxiety attacks on a neurotic basis.  She tends to be violent and disruptive at times."  (R. 197.)

In assessing her activities of daily living, Dr. Ottenberg reported that plaintiff could clean, shop, cook, use public transportation, and tend to her personal grooming and hygiene.  (R. 199.)  Plaintiff was deemed capable of initiating social contacts and speaking clearly, but had recurrent physical fights, problems interacting with authority, co-workers or peers, and was tense, combative and aggressive with the public.  (R. 200.)  With respect to concentration and task persistence, Dr. Ottenberg opined that plaintiff could carry out basic instructions, perform activities within a schedule and from beginning to end, as well as sustain a routine and make decisions; however, Dr. Ottenberg again noted that plaintiff had recurrent difficulties with authority figures.  (R. 201.)  Finally, Dr. Ottenberg opined that plaintiff's ability to adapt to changes was poor and she lacked personal insight, although had the ability to make decisions. (R. 202.)

In November 1998, another state agency psychologist reviewed plaintiff's medical

records and assessed her mental impairments.  (R. 136-39, 144-52.)  The examiner opined that plaintiff had only moderate limitations in the areas of ability to carry out detailed instructions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others; in all other areas the examiner deemed her not significantly limited.  (R. 136-37.)  The examiner concluded that plaintiff "retains the RFC to do simple and semiskilled jobs [and] socially she can ask questions and follow directions."  (R. 138.)  With respect to Listing 12.06 Anxiety Disorders the examiner opined that plaintiff met the "A" criteria as evidenced by anxiety and panic, and that she met the "A" criteria of Listing 12.08 Personality Disorders as manifested by pathological dependence, passivity, or aggressivity.  (R. 148-49.)  However, the examiner opined that plaintiff had only slight restriction of activities in her daily living, moderate difficulties in maintaining social functioning, seldom experienced deficiencies in concentration, persistence or pace, and had no episodes of deterioration or decompensation; thus, she did not satisfy the "B" criteria of any Listing.  (R. 151.)

On August 16, 1999, plaintiff's treating medical doctor, Dr. Mingroni, completed a Medical Assessment of Ability to do Work-Related Activities (Non-Exertional).  (R. 214-16.)  In all categories relating to her ability to make occupational adjustments he found her "seriously limited," noting specifically that in dealing with the public she was "combative [and] aggressive" and had "numerous problems" interacting with supervisors.  (R. 214-15.)  He further opined that plaintiff was seriously limited in her ability to understand, remember and carry out complex, or detailed but not complex, job instructions, but could understand, remember and carry out simple job instructions.  (R. 215.)  Further, he reported that she was seriously limited in her ability to

behave in an emotionally stable manner or relate predictably in social situations, describing her as "tense, combative-aggressive, [with] interpersonal difficulties, [and] close family dysfunction." (R. 216.) In a follow up to that questionnaire, Dr. Mingroni stated that he was aware of Dr. Ottenberg's concerns of "heavy alcoholic disposition, however, [he] had not seen any evidence of active drug or alcohol abuse." (R. 223.)

**B. Physical Impairments**

Medical records from Dr. Mingroni from May 1997 report a diagnosis of bronchitis, hypertension, history of fibroids and abdominal discomfort. (R. 173.) In August 1997, Dr. Mingroni diagnosed hypertension and, in December 1997, he reported hypertension as well as asthma/bronchitis. (R. 171-72.) He advised plaintiff to stop smoking and prescribed Inderal for the treatment of hypertension. (R. 171.) On February 11, 1998, plaintiff saw Dr. Richard Scheurmann for pain in her left-side and lower back. (R. 169.) On March 3, 1998, plaintiff reported to Dr. Mingroni pain in her left side, under her breast, difficulty walking and severe anxiety. (R. 168.) He diagnosed degenerative joint disease, panic attacks and hypertension; he prescribed Motrin, Ativan and an x-ray of plaintiff's left rib cage. (R. 168.) Plaintiff's medical records from South Philadelphia Radiology Center show a mammogram taken March 12, 1998, which revealed benign nodules (R. 182-83, 459-62), and x-rays of the left ribs and spine, which revealed no significant abnormalities. In April 1998, Dr. Mingroni again diagnosed hypertension, asthma/bronchitis and depression. (R. 171.) On September 22, 1998, plaintiff saw Dr. Mingroni for a left earlobe cyst, a urinary tract infection, hypertension and anxiety. (R. 221.)

In January 1999, plaintiff was diagnosed with hypertension, COPD (chronic obstructive pulmonary disease)/bronchitis, and anxiety and depression. (R. 219.) Dr. Mingroni again

prescribed Inderal and Ativan, and additionally, an Albuteral inhaler.  (R. 219.)  In March, plaintiff's diagnosis remained the same, and she was also prescribed Claritin.  (*Id.*)  In June of the same year, she reported an "ear popping sound," and her records indicate that her tension and stress were controlled with medications.  (R. 218, 426.)

On August 3, 1999, plaintiff again saw Dr. Mingroni for complaints of left breast pain, gastrointestinal distress, tension, stress, and tingling/weakness of her right upper extremity and right lower extremity.  (R. 217.)  Dr. Mingroni diagnosed gastroesophageal reflux disease, hypertension and depression.  (R.217.)  He also ordered an EMG of plaintiff's lower extremity which, along with nerve conduction studies, were completed by Dr. James F. Bonner on September 21, 1999.  (R. 217, 224-25, 432-33.)  The exams revealed "evidence of mild to moderate lumbar radiculopathy of multiple levels, primarily at L5 bilaterally . . . of chronic duration."  (R. 225, 433.)  After complaints of "neck pain which radiates into her upper extremities causing numbness and tingling into her hands," nerve conduction studies and EMGs were again performed in October 1999.  (R. 467-68.)  The report from the examination states that the "findings are consistent with bilateral C7 radiculpathy primarily of a subacute to chronic nature of mild intensity.  There was no evidence of peripheral or entrapment neuropathy, carpal tunnel syndrome brachial plexopathy or myopathy."  (R. 468.)

On October 19, 1999, records indicate that plaintiff would have a follow-up MRI after the diagnosis of lumbar radiculpathy as a result of the EMG.  (R. 427.)  She complained of pain in her leg in the lateral tibia and down to her foot.  (R. 427.)  Plaintiff was diagnosed with degenerative joint disease, anxiety disorder, depression, hypertension, and lumbar radiculpathy; her previous medications were continued and Celebrex was prescribed.  (R. 427.)  In December

1999, plaintiff again complained of left-side pain; her diagnoses remained the same.  (R. 428.)

On February 1, 2000, plaintiff's diagnoses and prescriptions remained the same; she complained

of numbness in both arms and hands for the previous two weeks.  (R. 429.)  Dr. Mingroni

reported no drug or alcohol use.  (R. 429.)  In addition to complaints of pain and anxiety and

depression, plaintiff was seen again in April for complaints of pain in her left breast (R. 430) and,

in May, for sinus pain, (R. 431).  She underwent a cardiovascular consultative examination on

May 12, 2000 after complaining of "shortness of breath with mild ambulation, i.e., she is short of

breath if she ambulates a block on a level plain or up one flight of stairs."  (R. 435.)  On June 15,

2000, plaintiff reported experiencing knee pain, which apparently had been exacerbated by

working at Colonial Beef Company where she had to stand on hard surfaces in cold for most of

the day, and for which she had been seen at the emergency room.  (R. 417, 437.)  An MRI taken

on July 12, 2000 revealed pre-patellar bursitis, a small tear in the medial meniscus,

chrondromalacia of the patella, trochlea and medial meniscus, tiny subchondral defect and

marrow edema posterial lateral aspect, a medial collateral ligament sprain and joint effusion.  (R.

366-67, 465-66.)  Plaintiff was admitted to St. Agnes Medical Center for arthroscopic

examination and debridement of the right knee, partial medial meniscectomy, and resection of

the plicae and lateral release of the right knee on August 2, 2000.  (R. 372-95.)  In addition to her

other medications, physical therapy was recommended by Dr. Mingroni on August 22, 2000.  (R.

416.)  He reported no drug or alcohol use.  (R. 416.)  In September and October, plaintiff had

follow up visits with her orthopedic surgeon and reported no pain in October.  (R. 456-67.)  On

November 21, 2000, plaintiff was seen for a mass in her left breast, hypertension and anxiety.

(R. 415.)  She was prescribed Darvocet for pain, in addition to continuing Zoloft and Ativan.  (R.

11

415.)  Again, Dr. Mingroni reported no drug or alcohol use. (R. 415.)

On January 17, 2001, plaintiff had a follow-up exam and x-ray of her knee, wherein Dr. Eric L. Hume reported that she "continues to have recurrent effusion and pain limiting her activity."  (R. 437.)  He further noted that "[s]he does get some benefit from Naprosyn . . . . Stiffness and swelling are a significant part of the symptomatic problem for her."  (R. 437.)  On physical examination, Dr. Hume noted "a moderated tension relatively large chronic effusion . . . some patellofemoral crepitus as well as lateral crepitus . . . [but] overall alignment of the knee is relative neutral."  (R. 437.)  Dr. Hume diagnosed mild medial compartment osteoarthritis and right joint effusion, which was reviewed and confirmed by another physician.  (R. 464).  He recommended a follow up MRI and a new antinflammatory, Feldene, and if that proved ineffective, plaintiff would undergo a series of aspiration and corticosteroid injections, depending on the MRI findings.  (R. 436.)

On January 22, 2001, plaintiff was diagnosed with COPD/chronic bronchitis, hypertension, anxiety/depression; her prescriptions were refilled then and again in March and April of 2001.  (R. 412-14.)  On March 1, 2001, she had a follow-up MRI and Dr. Hume wrote that the report "shows a degenerative tear in the posterior horn of the medial meniscus with predominantly degenerative changes in the medial compartment and the patellofemoral joint and a fairly significant effusion."  (R. 450.)  He recommended physical therapy and medical management.  (R. 450.)  Plaintiff had follow-up visits in with her orthopedic surgeon in November 2001, April 2002, July 2002, August 2003, October 2004, and November 2004.  (R. 358-362.)

The record contains far fewer medical records for the years subsequent to 2001.  On April

12

22, 2002, after a physical altercation with her neighbors, plaintiff was treated for an injury to her right upper extremity.  (R. 411.)  Her depression and anxiety were noted and prescriptions for Zoloft, Ativan and Darvocet continued.  (R. 411.)  The record states no use of drugs or alcohol.  (R. 411.)  Plaintiff underwent an MRI of the lumbosacral spine on August 23, 2002 and the impression was "[m]ild degenerative changes diffusely, not unusual for patient's age," "disc bulging and ligamentous hypertrophy" at L4-L5, "causing mild lateral recess stenosis bilaterally," without "focal disc herniation."  (R. 365, 442.)  Plaintiff saw Dr. Mingroni on May 13, 2003 and he diagnosed allergies, COPD, degenerative joint disease and anxiety.  (R. 410.)

On October 17, 2003, plaintiff underwent an MRI of the lumbar spine that revealed "hypertrophic fact joint disease, worse on the right side," at both the L3-4 and L4-5 levels, causing "spinal stenosis."  (R. 398-99.)  An MRI of plaintiff's lumbar spine from November 14, 2004 showed mild diffuse bulging, mild diffuse arthropathy, mild central canal stenosis, and no evidence of disc protrusion or neural foramina stenosis.  (R. 363-64, 443-45.)  On December 15, 2004, plaintiff was seen for low back pain; she reported drinking socially.  (R. 397.)  On January 3, 2005, plaintiff was seen for a refill of Xanax.  (R. 408.)  On January 5, 2005, plaintiff received a sacroiliac joint steroid injection for her lower back pain, which she reported was a nine on a pre-operative pain scale, indicating between "Very Severe Pain" and "Worst Pain Ever."  (R. 402-07.)  Her chart indicates that she tolerated the procedure well.  (R. 402.)

**C.  Plaintiff's Hearing Testimony**[3]

At both hearings, plaintiff testified as to her limitations and her daily activities.  (R. 240-

---

[3]This section contains a summary of testimony from both of plaintiff's hearings before an ALJ.

73, 496-543.)  She stated that she had experienced back pain for the previous four to five years, which had gotten worse in the previous few months.  (R. 511.)  Plaintiff testified that despite her surgery, her knee still bothers her.  (R. 512.)  Plaintiff stated she had no problems with sitting as long as she had a firm seat.  (R. 516.)  She reported problems walking and standing, stating that "with the back it's kind of like a pressure, it bends, I mean, it makes your legs like kind of limp where you can't stand.  Even if I walked up the steps."  (R. 515; *see also* R. 255-56.)  She also stated that she could not lift heavy bags, which her daughter did for her, and that she used a step ladder because she could not reach above her head. (R. 516.)  Plaintiff does not do her own laundry and a friend drives her to appointments.  (R. 257, 519-20.)  Plaintiff testified that she would not be able to stoop and get back up again because "[i]t bothers [her back] and [her] knee on the left side, not the right . . . and sometimes [her] toes [] get numb."  (R. 516.)  Plaintiff explained that she sleeps irregularly, only sleeping for two or three hours at a time.  (R. 259-60, 264, 519.)

She testified that she socializes infrequently and attends church once per month.  (R. 258, 520.)  Plaintiff explained that she goes out rarely in order to prevent having conflicts with others and because when she is out "[i]t just feels like something is going to happen."  (R. 523-24.)  She explained that she has been having panic attacks for at least the past twenty years, stating "I just break out in a sweat, my stomach, it jumps.  I feel like I really want to jump out."  (R. 249.)  She explained that the panic attacks are exacerbated by being around people, which causes her to not want to go out.  (R. 249.)  She also described her frequent confrontations–including physical fighting–with others.  (R. 250, 261-63.)

Plaintiff testified that she used to drink beer and smoke marijuana once per week, but

14

currently drinks only socially.  (R. 254, 509-10.)  She stated that she used those substances to give her an appetite and to calm her.  (R. 522.)

**D.  Medical Expert Testimony**

At the second hearing, an ME, Dr. Richard Saul, testified regarding plaintiff's limitations. (R. 525-35.)  After reviewing plaintiff's mental health records, the ME opined that during the years 1997-1999, her restrictions of daily living were moderate, difficulties of maintaining social functioning were marked, and difficulties in maintaining concentration, persistence of pace was somewhere between mild and moderate.  (R. 528.)  He specifically added that substance abuse was a significant contributing factor.  (R. 528-29.)  The ME stated that he could not assess later periods because of the lack of medical records, but noted that plaintiff had indicated that she had "mellowed out over the years . . . because of age."  (R. 528.)

The ME explained that borderline personality disorder is aggravated by drinking (R. 529), but also that persons with borderline personality frequently resort to drinking because it can depress symptoms of aggression and anger (R. 534).  He opined that without substance abuse, plaintiff's limitations of social functioning "would be more of the moderate range than in the marked range."  (R. 529.)  There was some discussion regarding the ME's definition of marked versus moderate limitations that took place during the hearing, as discussed in part IV.A, *infra*. (R. 530-31.)

**E. Vocational Testimony**

At plaintiff's second hearing, a VE, Bruce Martin, testified to assist the ALJ in determining whether jobs exist in the national and local economies that a person of plaintiff's age, education and mental/physical limitations could perform.  (R. 536-41.)  The VE classified

plaintiff's past relevant work as nursing assistant as semi-skilled, medium work; work as a meat

packer as unskilled,[4] medium work; and job as a wrapper as unskilled, light work.[5]  (R. 536.)

The ALJ asked the VE whether a hypothetical person of advanced age, 55 and older, with

limitations as described by the ME–limitations involving social contacts–and specifically, limited

public contacts, could return to plaintiff's prior jobs.  (R. 536-37.)  The VE confirmed that the

prior work would be somewhat questionable.  (R. 537.)  However, the VE opined that someone

with that profile could do cleaning work–a simple, routine job, performed in isolation.  (R. 537-

38.)  However, the VE explained that due to "occasional odors from cleaners, chlorinated base

cleaners and dust," a person who needs a clean environment would be precluded from such work.

---

[4]While the hearing transcript records the VE as stating that work as a meat packer is
skilled work, the VE stated "SVP is two," which is a specific vocational preparation time that
corresponds with unskilled work.  *See* SSR 00-4p (stating "unskilled work corresponds to an
SVP of 1-2").

[5]Light work involves lifting no more than twenty pounds at a time with frequent lifting or
carrying of objects weighing up to ten pounds.  Even though the weight lifted may be very little,
a job is in this category when it requires a good deal of walking or standing, or when it involves
sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered
capable of performing a full or wide range of light work, a claimant must have the ability to do
substantially all of these activities.  If someone can do light work, he or she is considered able
also to do sedentary work.  20 CFR §§ 404.1567(b), 416.967(b).

Medium work involves lifting no more than fifty pounds at a time with frequent lifting or
carrying of objects weighing up to twenty-five pounds.  If someone can do medium work, he or
she is considered to be capable of sedentary and light work.  §§ 404.1567(c), 416.967(c).

Unskilled work is work which needs little or no judgment to do simple duties that can be
learned on the job in a short period of time.  The job may or may not require considerable
strength.  §§ 404.1568(a), 416.968(a).

Semi-skilled work is work that needs some skills but does not require doing the more
complex work duties.  Semi-skilled jobs may require alertness and close attention to watching
machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or
guarding equipment, property, materials, or persons against loss, damage or injury; or other types
of activities that are similarly less complex than skilled work, but more complex than unskilled
work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as
when hands or feet must be moved quickly to do repetitive tasks.  §§ 404.1568(b), 416.968(b).

(R. 540.)  The VE stated that a job as a production laborer, most of which are found at the

medium exertional level, would also fit the ALJ's hypothetical description.  (R. 540-41.)  The

VE also opined that if plaintiff's testimony were credited, notably her testimony regarding her

pain and postural limitations, she would not be capable of maintaining any jobs.  (R. 538.)

## F. ALJ's Findings

By decision dated April 2, 2005, the ALJ denied plaintiff's claims, finding, in relevant

part as follows:

> 4. The claimant's knee impairment, asthma, a major depressive disorder, an anxiety-related disorder, a borderline personality disorder, and a history of alcohol abuse are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).
>
> ***
> 6. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.
>
> 7. The claimant has the following residual functional capacity with the continued abuse of alcohol: the claimant is unable to mentally do sustained work activities in an ordinary work setting on a regular and continuing basis.  The claimant is significantly limited by a reduced ability to function socially and has poor emotional control.
>
> 8.  The claimant is unable to perform any of her past relevant work when drinking alcohol (20 CFR § 404.1565).
>
> 9. The claimant was 53-58 years old during the relevant time period in question.  The ages are defined in the regulations as an individual closely approaching advanced age and advanced age (20 CFR § 404.1563).
>
> 10. The claimant has "a limited education" (20 CFR § 404.1564).
>
> 11.  The claimant has no transferrable skills from any past relevant work (20 CFR § 404.1568).
>
> 12. Considering the claimant's age, education, past work experience and residual

functional capacity based on all of the claimant's severe impairments, including alcoholism, the claimant is unable to make an adjustment to work existing in significant numbers in the national economy. A finding of "disabled" is therefore appropriate.

13. Considering all of the claimant's severe impairments, including alcoholism, the claimant is under a disability as defined in the Social Security Act (20 CFR § 416.920(g)).

***

15. If the claimant stopped using alcohol, the claimant would retain the following residual functional capacity: to perform at the medium level of exertion. The claimant has non-exertional limitations. Due to her asthma, she must be permitted to work in a clean environment. She is limited to performing simple, routine jobs because of her mental impairments, and has moderate limitations in social functioning and concentration.

16. If the claimant stopped using alcohol, the claimant would be able to perform past relevant work as a packager (20 CFR § 416.965).

17. If the claimant stopped using alcohol, although the claimant's exertional and non-exertional limitations do not allow her to perform the full range of medium work, using Medical-Vocational Rules 203.12 and 203.19 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs, provided by the testimony of the Vocational Expert, include work as a production laborer, of which there are 40,000 regionally and 80,000 jobs nationally. A finding of "not disabled" is therefore appropriate.

18. Because the claimant would not be disabled if she stopped using alcohol, alcoholism is a contributing factor material to the determination of disability (20 CFR § 416.935 and Social Security Ruling 82-60).

19. The claimant is not considered to be under a disability pursuant to Section 105 of Public Law 104-121.

20. The claimant was not under a "disability" as defined in the Social Security Act, at any time during the relevant time period. (July 1, 1997 to August 19, 2002) (20 CFR § 404.1520(g)).

(R. 289-91.)

The ALJ explicitly based his opinion of plaintiff's mental impairments on the testimony

of the ME, finding that "the record supports a finding that the mental impairments result in moderate restriction in activities of daily living, marked difficulties with social functioning, moderate difficulties in maintaining concentration, persistence and pace."  (R. 284.)  However, again relying on the ME's expertise, "[w]ithout excessive alcohol consumption (which appeared to end in 1999)," plaintiff's limitations would only be moderate.  (R. 285.)

With respect to plaintiff's credibility, the ALJ found her "not fully credible, in light of the medical evidence," because plaintiff "tended to exaggerate her symptoms and minimize her capabilities, which undermined her credibility."  (R. 285.)  For example, plaintiff complained of knee pain, but the diagnostic studies showed bursitis, not a chronic problem, and mild medial compartment osteoarthritis."  (R. 285.)  Further, "she admitted to being non-compliant with her medications" and to "still drinking beer on social occasions."  (R. 286.)

## G.  Magistrate Judge's Opinion

The Magistrate Judge recommended remand on three bases: 1) the confusion regarding "rating definitions" applied by the ME; 2) the lack of a medically supported physical RFC; and 3) the consequently flawed hypothetical question presented to the VE.  The Commissioner has objected to the entirety of the Magistrate Judge's opinion and additionally argues that the decision of the ALJ is supported by substantial evidence.  Plaintiff has responded to the Commissioner's objections but has not lodged separate objections to the report and recommendation.  I will address each of the Commissioner's objections in turn.

## III.  Legal Standards

I review *de novo* the parts of the Magistrate Judge's report to which the Commissioner

objects.  28 U.S.C. § 636(b)(1)(C).  I may accept, reject, or modify, in whole or in part, the

Magistrate Judge's findings or recommendations.  *Id.*

    In contrast, a district court may not review the Commissioner's decision *de novo*.  The

court may only review the Commissioner's final decision to determine "whether that decision is

supported by substantial evidence."  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing

42 U.S.C. § 405(g)).  "[S]ubstantial evidence is more than a mere scintilla."  *Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation omitted).  "Substantial evidence

'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  *Hartranft*, 181 F.3d at 360

(quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  In making this determination, the

court must consider "the evidentiary record as a whole, not just the evidence that is consistent

with the agency's finding."  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

The substantial evidence test is "deferential."  *Id.*  Consequently, the court "will not set the

Commissioner's decision aside if it is supported by substantial evidence, even if [the court]

would have decided the factual inquiry differently."  *Hartranft*, 181 F.3d at 360.

    Before a district court can review the record to determine if the Commissioner's final

decision is supported by substantial evidence, the Commissioner must provide an explanation for

his findings in order to allow for meaningful judicial review.  *Burnett v. Comm'r of Soc. Sec.*,

220 F.3d 112, 119 (3d Cir. 1981) (holding that an ALJ must "set forth the reasons for his

decision").  The ALJ cannot simply state a conclusion "without identifying the relevant listed

impairments, discussing the evidence, or explaining his reasoning."  *Burnett*, 220 F.3d at 119.

The Third Circuit has stated that "we need from the ALJ not only an expression of the evidence

[he] considered which supports the result, but also some indication of the evidence which was rejected" in order to determine "if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d 700, 705 (3d Cir. 1981).  Without such information, the ALJ's findings are "beyond meaningful judicial review." *Burnett*, 220 F.3d at 119; *see also Cotter*, 642 F.2d at 705-06.  Without the ability to meaningfully review the ALJ's conclusions, a court is compelled to "vacate and remand the case for a discussion of the evidence and an explanation of reasoning supporting" those conclusions.  *Burnett*, 220 F.3d at 120.

To determine if a claimant is disabled, the Commissioner applies a five-step process of evaluation under 20 C.F.R. § 404.1520.  The first two steps of the analysis involve threshold determinations of whether the claimant is working, 20 C.F.R. § 404.1520(a), and whether the claimant's impairment is of required duration and severity to significantly limit his or her ability to work, 20 C.F.R. § 404.1520(c).  The third step is comparing the evidence of medical impairment against a list of impairments that would permit the claimant to qualify for disability without further inquiry.  20 C.F.R. § 404.1520(d).  If the claimant does not qualify for benefits automatically according to this list, the Commissioner proceeds to the fourth and fifth steps of the analysis.  In the fourth step the Commissioner determines whether the claimant retains the residual functional capacity to perform work similar to that he or she has performed in the past.  20 C.F.R. § 404.1520(e).  In the fifth and final step, if the Commissioner finds that the claimant is unable to perform any other work that exists in the national or regional economies, she must find the claimant to be disabled.  20 C.F.R. § 404.1520(f); *see also Sullivan v. Zebley*, 493 U.S. 521, 525 (1990) (expounding on the application of this five-step process).

21

**IV.  Discussion**

**A.  Rating Definitions**

During his testimony, the ME categorized plaintiff's mental limitations and difficulties using the accepted terminology of "moderate" and "marked."  These descriptions of a plaintiff's limitations are significant to determining whether a plaintiff meets the criteria for a Listed impairment or retains the RFC to perform past relevant work or other work that exists.  After referring to the relevant portion of the record, the Magistrate Judge found that there was confusion regarding the definitions the ME was attributing to the categories of "marked" and "moderate" for purposes of describing plaintiff's mental limitations.[6]  The Magistrate Judge determined that a remand was appropriate because "the court cannot conclusively state that no error was made, and since remand is appropriate in this case for other reasons, upon remand the Commission should, through written interrogatories and/or oral testimony, clarify the ME's intent and use of the rating definitions."  (Rep. & Recom. 21.)

The Commissioner objects to remand on this basis for two reasons.  First, the Commissioner argues that it seems clear from the Magistrate Judge's statement that she would not have recommended remand based on this issue alone.  (Gov't Obj.'s 2.)  Second, the inability to state that "no error was made" exceeds the substantial evidence standard of review, which, the Commissioner maintains, exists to support the ALJ's determination.

Plaintiff argues that a significant confusion exists and that because the ME was stating a

---

[6]The Magistrate Judge also noted in the margin another ALJ decision in which the same ME had used word descriptions generally considered "marked" while opining that a claimant's limitations were only moderate.  (Rep. & Recom. 21 n.21.)

restriction was "moderate" when using a definition corresponding with a "marked" restriction, plaintiff should have been deemed *per se* disabled at Step 3 of the sequential analysis.  Plaintiff has attached the Commissioner's "Medical Source Statement of Ability To Do Work Related Activities (Mental)," which defines the classifications of "none," "slight," "moderate," "marked," and "extreme" for purposes of rating a claimant limitations.  (Pl.'s Mot. Summ. J., Ex. A.); *see also*, Agency Information Collection Activities:  Proposed Request and Comment Request, 71 Fed. Reg. 961, 963 (stating that the Medical Source Statement of Ability To Do Work Related Activities (Physical and Mental) "are used to collect data that is required to determine the residual functional capacity (RFC) of individuals who are appealing denied claims for benefits based on disability").   The form directs the evaluator to use the following definitions for the rating terms:

> Moderate–There is a moderate limitation in this area but the individual is still able to function satisfactorily.
> Marked–There is serious limitation in this area.  The ability to function is severely limited but not precluded.
> Extreme–There is major limitation in this area.  There is no useful ability to function in this area.

(Pl.'s Mot. Summ. J., Ex. A.)  The relevant portion of the hearing transcript is as follows:

> ALJ:  Okay.  Now, when you indicate that the limitations, the various limitations that you noted are moderate do you mean they are precluded or that they are impacted but not precluded?

> ME:  Impacting but not precluded.

> Atty:  Your Honor, is that the same thing as seriously limited but not precluded? The agency has forms.

> ALJ:  Is it seriously limited but not precluded?

ME:  In terms of marked that I mention and socially, is that what you're talking about?

Atty:  In terms of moderate I guess.

ALJ:  Not marked but moderate.

ME:  I would say that it was not precluded but it was seriously limited that particular area because of the violence that she had at that particular time.

ALJ:  I'm sorry, now I'm a little confused.

Atty:  Now I'm confused I think.

ME: Okay.

ALJ: When you saw marked –

ME:  When I say marked in the B criteria?

ALJ: In social, right.  You're indicating something is seriously limited I take it but the real question is does that preclude the interaction for example?

ME:  I think in her case, yes, yes.

ALJ:  Okay.  Now, when you say moderate does that mean it's still seriously impacted but not precluded?

ME:  Not precluded.

ALJ:  Not precluded.

(R. 530-31.)  I agree that the record of the proceeding demonstrates confusion as to the

definitions the ME was using to classify plaintiff's restrictions.

Because the ALJ explicitly relied on the ME's determination of plaintiff's mental health

limitations–specifically that she only suffered from "moderate" restrictions in social functioning

in the absence of the use of alcohol–remand is appropriate to clarify the ME's definitions of the

appropriate terms.  This clarification is crucial because had plaintiff suffered from "marked" limitations of social functioning even in the absence of alcohol use, the determination of her ability to perform substantial gainful activity would likely have had a different outcome or she may have met the criteria for a Listing at Step 3 of the sequential analysis.  Thus, in the absence of clarification, it is not possible to discern whether substantial evidence supports the ALJ's conclusion.  However, this ambiguity may be resolved through the use of simple written interrogatories or a statement by the ME, as suggested by Magistrate Judge Wells.   Accordingly, I will overrule the Commissioner's objection.

**B.  Physical RFC**

The Magistrate Judge's first report and recommendation, which I adopted on April 23, 2004, without objection from the parties, states as follows:  "Finally, upon remand, the ALJ should obtain a physical RFC.  This court found no medical assessment of Plaintiff's exertional limitations, thus, was unable to determine the appropriateness of exertional parameters set by the ALJ in her RFC presentation to the VE."  (R. 337.)  In the current report and recommendation, the Magistrate Judge found that such an assessment had not been undertaken as directed and, furthermore, the record still lacked evidence from which plaintiff's physical RFC could be evaluated.  (Rep. & Recom. 22-23.)  Moreover, the Magistrate Judge concluded that there was other evidence in the record that the ALJ did not address that would have supported less than the medium exertional ability the ALJ found plaintiff to have.  (*Id.* at 24-25.)  The Magistrate Judge further bolstered her conclusion that a medically supported physical RFC was necessary by pointing out that the VE testified that plaintiff's subjective allegations of pain and postural limitations, in combination with her other impairments, would preclude all work.   (*Id.* at 25.)

25

The Commissioner lodges several objections.  First, that the Magistrate Judge's interpretation of the prior order is incorrect and it only mandated the ALJ to seek additional medical opinion if necessary.  (Def. Obj.'s 2).  The Commissioner also objects stating that there is no independent requirement that an ALJ seek such a statement and substantial evidence supports the determination of the ALJ that plaintiff is capable of doing medium work in a clean environment.  (*Id.* at 3–6.)

The report and recommendation adopted by this court was clear that the Commissioner was to obtain a physical RFC in order to appropriately assess plaintiff's physical limitations.  The order issued by the court directed "[t]he matter be REMANDED to the [Commissioner] to allow the [ALJ] conduct additional proceedings consistent with this Report and Recommendation."  (R. 317.)  Thus, the ALJ should have obtained an medically supported physical RFC in order to determine the extent of plaintiff's physical limitations.  While the order itself directs the Commissioner to, *inter alia*, "reassess the severity of [p]laintiff's Borderline Personality Disorder and hypertension" and "if necessary, seek additional medical opinion to determine if these conditions singly or combined with [p]laintiff's other impairments, meet or equal a listed impairment," (R. 317), that does not, as the Commissioner argues, negate the express mandate contained in the report and recommendation to obtain a medically supported RFC.

While it is certainly true that there is no independent requirement that a physical RFC or specific form of medical opinion be obtained by an ALJ, the Magistrate Judge issued such a directive recognizing the absence of medical evidence to support any determination of plaintiff's exertional capabilities.  An ALJ is simply not authorized to evaluate medical conditions himself. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d

26

Cir. 1985); *see also Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1155 (3d Cir. 1983) ("An ALJ is not free to set his own expertise against that of physicians who present competent medical evidence." (internal quotation omitted)).  He may not make "purely speculative inferences from medical reports," *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981), nor may he make medical findings based on "amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility."  *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983); *see also, e.g.*, *Morales v. Apfel*, 225 F.3d 310, 316-17 (3d Cir. 2000) (defining substantial evidence and citing *Kent*, 710 F.2d at 114).  To support his decision with substantial evidence, the ALJ must cite to the opinion of a physician for medical conclusions when there is contradictory evidence in the record.  *Ferguson*, 765 F.2d at 37.  The Third Circuit has admonished:  "By independently reviewing and interpreting the [medical evidence], the ALJ impermissibly substitute[s] his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence.  Again, if the ALJ believe[s] that [a doctor's] reports [are] [not satisfactory], it [is] incumbent upon the ALJ to secure additional evidence from another physician."  *Id.*  Above all, an ALJ may not reach a decision about a claimant's medical condition solely on his own "non-expert observations at the hearing — in other words, by relying on the roundly condemned 'sit and squirm' method of deciding cases."  *Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d Cir. 1983) (citing *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982) and *Aubeuf v. Schweiker*, 649 F.2d 107, 113 n.7 (2d Cir. 1981)); *see also Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000) (citing *Van Horn*).

It may very well be that plaintiff is capable of performing medium work.  *See supra* note

5. However, as noted by the Magistrate Judge, there was other medical evidence in the record, including the statement of plaintiff's treating physician, Dr. Mingroni, and plaintiff's own statements, which could contradict the ability to do medium work, and plaintiff herself was never asked about her ability to do the essentials of medium work, including lifting, carrying, sitting, standing, bending, stooping, crouching, kneeling, and crawling. (*See* Rep. & Recom. 24-25.) Thus, the prior directive to obtain a physical RFC was still necessary. *See Kent*, 710 F.2d at 114-115 (stating that the ALJ's "conclusion may not be permitted to stand" where "the Secretary adduced no evidence that appellant was capable of doing [sedentary work]" and was based on "his own amorphous impressions, gleaned from the record and from his evaluations of appellant's credibility"); *see also Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) ("The problem is that we don't know what [the ALJ] thought. And in particular . . . we do not know on what basis he decided that [the claimant] can stand for two hours at a time. No physician said that."). Accordingly, I will overrule the Commissioner's objection based on the facts of this case and the prior report and recommendation.

**C. Hypothetical Question to the VE**

The Magistrate Judge lastly found that given the absence of a clear-cut physical RFC, one essential assumption of the RFC presented to the VE was flawed. (Rep. & Recom. 25.) This determination is thus linked to the second that a medically supported physical RFC was lacking. As such, the Commissioner makes the same objections and argues that the hypothetical was legally sufficient. (Def.'s Obj.'s 6.) The Third Circuit has explained that "'the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the

28

claimant's individual physical and mental impairments.'"  *Burns v. Barnhart*, 312 F.3d 113, 123

(3d Cir. 2002) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)).  The

hypothetical question "must reflect all of a claimant's impairments."  *Id*. (citing *Chrupcala v.*

*Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).  Because, as discussed above, the ALJ improperly

assessed plaintiff's RFC, the hypothetical question to the VE was insufficient.  Accordingly,

plaintiff's RFC must be assessed and resubmitted to a VE and the Commissioner's objection is

overruled.


**IV. Conclusion**

For the foregoing reasons, I will overrule Commissioner's objections and adopt the

Report and Recommendation of Magistrate Judge Wells.  Accordingly, I will grant plaintiff's

motion for summary judgment in part and deny it in part, deny the Commissioner's motion for

summary judgment, and remand the case for further proceedings consistent with this

memorandum and order.  I pause only to note my disappointment that plaintiff's claim was not

adjudicated consistent with the previous report and recommendation that I adopted; plaintiff's

application has been pending for almost ten years and must henceforth be acted upon

expeditiously.  The Third Circuit has repeatedly voiced its concern with applications that have

been delayed for this length of time.  *See, e.g.*, *Cadillac v. Barnhart*, 84 F. App'x 163, 164 (3d

Cir. 2003) ("register[ing] . . . disappointment and disapproval at the unconscionable delay that

has plagued Cadillac's application at nearly every level of the review process" and cataloging

previous cases wherein the Third Circuit has "voiced concerns," including instances where the

determination has taken ten, eight and five years").  As such, the Commissioner shall promptly

comply with this memorandum and order.  An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                                          |     |               |
|------------------------------------------|-----|---------------|
| LOIS TRAYLOR-LAMB,                       | :   |               |
| Plaintiff,                               | :   | CIVIL ACTION  |
|                                          | :   |               |
| v.                                       | :   | NO. 05-2971   |
|                                          | :   |               |
| MICHAEL J. ASTRUE,                       | :   |               |
| Commissioner of Social Security,         | :   |               |
| Defendant.                               | :   |               |

## Order

AND NOW, this _____ day of July 2007, upon consideration of the parties' cross-motions for summary judgment (Docket Nos. 9, 10) and plaintiff's reply to the Commissioner's motion for summary judgment, and after careful and independent review of the report and recommendation of U.S. Magistrate Judge Wells and the Commissioner's objections thereto, it is hereby ORDERED that:

1. The Commissioner's objections are OVERRULED.

2. The Report of Magistrate Judge Wells is APPROVED and ADOPTED

3. Plaintiff's motion for summary judgment is GRANTED to the extent that I am remanding.

4. The Commissioner's motion for summary judgment is DENIED.

5. The matter is REMANDED to the Commissioner for further proceedings consistent with this memorandum and order.

<u>    s/ William H. Yohn Jr.    </u>
William H. Yohn Jr., Judge